(48 App. Div. 378.)

BOUTON v. WELCH et ux.

(Supreme Court, Appellate Division, Third Department.    March 7, 1900.)

WILLS—CONTRACT TO DEVISE—EVIDENCE.

Testator executed a deed to certain land to defendant, who on the same day gave testator a purchase-money mortgage thereon for $2,000, the full value of the land, and also gave him a deed, in which defendant's wife joined, of their farm, valued at $1,000. Defendant testified that the exchange of farms was made at testator's solicitation, who wished to aid defendant's wife, his adopted daughter; and he agreed that the mortgage, which was given for the full value of the land, to protect it from liens, etc., should be given to her at his death. Other witnesses testified to conversations with testator in which he stated that the mortgage was to go to defendant's wife when he was through with it, and that it was given to keep the land clear for her. Nothing was ever paid on the mortgage, except some small credits of farm produce. *Held*, that the evidence established an enforceable agreement by testator with defendant to assign the mortgage to his wife, or bequeath it to her by will, and that it would be enforced.

Appeal from judgment on report of referee.

Action by De Witt C. Bouton, as executor of Gershom Hanford, deceased, against William Welch and Alice Welch. From a judgment for plaintiff, Alice Welch appeals. Reversed.

This is an action for the foreclosure of what purports to be a purchase-money mortgage for the sum of $2,000 given by the defendant William S. Welch in the month of January, 1887, to the plaintiff's testator, Gershom Hanford, upon a farm known as the "Grant Farm." The defendant Alice Welch is the wife of the defendant William S. Welch, but she did not join in the execution of the mortgage. The defendant Alice Welch in her amended answer alleges: That prior to the execution of the mortgage in question the defendant William S. Welch, her husband, was the owner of a farm in Danby, N. Y., consisting of about 30 acres of land, known as the "Axford Farm," worth the sum of $1,000, and in which she had a dower interest. That the plaintiff's testator was the owner of the premises described in the mortgage, and the value of such premises did not exceed the sum of $2,000. The plaintiff's testator, Gershom Hanford, desiring to make some provision for the defendant, who was his adopted daughter, induced the defendants William S. Welch and Alice Welch to exchange said farms, which exchange was accordingly made, and that at the time of such exchange the said Gershom Hanford took from the said William S. Welch a mortgage for the sum of $2,000, being the full value of the farm, and that it was agreed at that time between the said Gershom Hanford and William S. Welch and Alice Welch that at the death of the said Gershom Hanford said property was to be the property of Alice Welch, and that such exchange of farms was made and such mortgage given upon such agreement. That said testator was to retain said mortgage only during his life, and at his death it was to become absolutely the property of Alice Welch, by bequest, or he would assign the same to her prior to his decease, and that then such exchange of farms was made, and the mortgage given, relying upon said promise and agreement of said Hanford. That the defendants resided upon such farm as their own. That the testator died without having assigned said mortgage, neither did he bequeath the same in his will to the defendant Alice Welch, but did bequeath the same to his widow, Mary Hanford. And she demands judgment that she be declared to be the owner of said mortgage and all the money due thereon, and that the defendant William Welch, and all persons claiming under him subsequent to the commencement of this action, may be barred and foreclosed of all right, claim, lien, and equity of redemption in and to the mortgaged premises, and that the same be sold according to law, and that all moneys due thereon be paid to her, the said Alice Welch. The case was referred to a referee for trial. Upon the trial

the defendant William S. Welch consented that judgment might be taken against him as prayed for in the complaint, and the trial of the action was continued against Alice Welch, the only question litigated being her ownership of the mortgage under the agreement claimed by her in her answer. The referee found that she was not entitled to be declared the owner of said mortgage, and that the only right she has in the premises is an inchoate right of dower, which is subject to the mortgage above described, and awarded judgment to the plaintiff. From the judgment entered upon the referee's report, the defendant Alice Welch has appealed to this court.

Argued before PARKER, P. J., and HERRICK, MERWIN, SMITH, and KELLOGG, JJ.

George B. Davis, for appellant.

Tompkins & Cobb (M. N. Tompkins, of counsel),, for respondent.

HERRICK, J. The principal question to be decided in this appeal is one of fact; that is, as to the verity of the agreement claimed by the defendant Alice .Welch to have been made between her husband and Gershom Hanford for her benefit. The solution of this question requires a somewhat extended discussion of the evidence in the case.

On the 29th day of January, 1887, a deed of the farm known as the "Axford Farm" was given by William S. Welch and Alice Welch, his wife, to Gershom Hanford, for the expressed consideration of $1,200. This deed was not recorded until the 26th day of May, 1898. Upon the same day a deed of the Grant farm was made by Gershom Hanford to William S. Welch for the expressed consideration of $3,200. That deed has never been recorded. Upon the same day William S. Welch executed a mortgage upon the Grant farm, which purports to have been given as part of the purchase price of said premises, for the sum of $2,000; $50 to be paid on the 1st day of April, 1888, and $50 in each and every year thereafter, with annual interest upon all sums remaining unpaid. The mortgage was unaccompanied by any bond, and the clauses in the blank which was used, which referred to the matter of insurance and to a bond, are both erased. This mortgage was recorded on the 31st day of December, 1892. The referee has found that the difference in value between the farms was not to exceed $1,000. Upon the trial the defendant offered proof, which was rejected, that the so-called Axford farm was worth not to exceed $1,000, and the so-called Grant farm was worth not to exceed $2,000, at the time of their transfer and the execution of the mortgage in question. The question at once arises, why should the defendant Welch convey his farm to Hanford, accept the conveyance from Hanford of the Grant farm in return, and give back a mortgage upon it for its full value, thus practically giving away his own farm for nothing, and receiving a farm incumbered for its full value? Or, to state it in another form, why should he give a mortgage for double the amount of the difference in the value between the farms exchanged? The defendant William S. Welch's story of the reasons for such exchange made, and the giving of such mortgage, is, in substance, as follows: The defendant and his wife, Alice Welch (who was the niece of Gershom Hanford), and their four children, had been living upon the Axford

farm for some three or four years, when their house burned, in the month of October, 1886. The next day after the fire, Mr. Hanford came over to the Axford place and asked Welch, to use Welch's words—

"What we were going to do, now we had no place to live. I told him I did not exactly know just then. My father had made a proposition to me that I wanted to consider. And he said when we got together, to keeping house again, that he wanted us to move up on his farm. He had always calculated to do something for Alice, and thought then was a time, when it would do as much good as any other time, and maybe more."

The Welches moved upon the Grant farm some time in the month of November, and according to Welch's testimony there were conversations relative to exchanging farms; that Hanford came there quite frequently; that in the first conversation—

"He asked me what I thought about trading. I told him I didn't know. If he was going to do something for Alice, why, he would have to have his own way, I supposed, about that. He could give her what he seemed disposed to give. And he said that he would change places; I give him a mortgage of $2,000, and all he would require on that mortgage would be what produce he wanted to use on his table,—that that farm would produce, and we had to spare. I also was to work the lower place (that was the Axford place; we termed it the 'Lower Place') on shares. I told him that was too large. I told him $2,000 was more than the place was worth. Well, he said, it had got to be enough, so when he left the mortgage for my wife that she could foreclose that mortgage; that she had got to have the controlling interest in that place,—the Grant place; that he was doing this to benefit her. He said nothing more in this conversation than that she should have the mortgage; that he would give her the mortgage when he was through with this property; that the mortgage should be hers."

This conversation, the defendant states, was some three or four weeks before the execution of the mortgage and exchange of deeds. Other conversations to the same effect were had. Finally they went to the office of an attorney named Hungerford to have the papers drawn up, where he says that Mr. Hanford stated (I presume to Hungerford):

"He was trading farms with me, and I was to give him a mortgage of $2,000, and he was to hold the mortgage during his lifetime, and at his death it was to be my wife's. I asked Mr. Hungerford if that would be all right. That was in Mr. Hanford's presence. He said it was. He said Mr. Hanford was responsible for any agreement or bargain he made."

Being asked upon the examination as to whether anything was said between them as to the comparative value of the two places, the witness Welch answered as follows:

"When I told him the mortgage was too much, he wanted to know what I thought the difference was between the two places: 'What do you call your place worth, and what do you think this is worth?' 'Why,' I said, 'in my estimation there is not more than one thousand ($1,000) dollars difference between the two places.' 'Well,' he said, 'that don't make any difference whether it is one hundred or two thousand dollars, or whether it is only one dollar. Your wife will get the mortgage, and it don't make any difference about the difference in value of the places, in these deeds.' I told him that in my estimation the Grant place was not worth anything more than the mortgage, and I didn't think it was as much as what he wanted. This was at different times, but one day in particular was the day we drew these writings at Hungerford's office."

Upon his redirect examination Mr. Welch testified:

"When I gave this mortgage to Mr. Hanford he said he would not have that mortgage recorded, because it was not his mortgage; he was only holding it for Alice to secure his life control; that if he put it on record the assessors would find it and oblige him to pay taxes on it, and it was not his mortgage, and he thought it was not right for him to pay taxes on it. That was said in Hungerford's office."

Upon his recross-examination he testified as follows:

"That was just after the mortgage was signed. Think it was the last thing that he said when we left the office. He had the mortgage, and I had my deed, and he had his deed. I let my $1,000 farm go, and gave a mortgage for the value of the one I got back, because I thought my wife would get $1,000 worth of property from his at his death. I took no writing. I had just that confidence in Gershom Hanford. I don't know why I didn't have the deed made to my wife instead of to me. I don't think it was ever mentioned. I did not owe any debts in those days. Some of these conversations were in the presence of my wife. They were not always in her presence. She was at Hungerford's office. Remember of three conversations in particular, and remember what I was doing. Could not give dates. I did not know that he did put this mortgage on record. I knew it last January. I saw the mortgage was put on record. That is the first I knew of it. It was recorded in '92."

There are indorsed upon the mortgage various amounts as having been paid thereon. William Welch testifies, however, that he never paid any money thereon; that all that was received by Mr. Hanford from him upon the mortgage was farm produce. Welch's statement of the agreement in relation to the mortgage affords an explanation of why he gave a mortgage for double the amount of the difference in value between the farm he received and the one he conveyed; and the fact that he gave back a mortgage for nearly, if not quite, the entire value of the farm conveyed to him, lends credibility to the story he tells as to the agreement to give the mortgage to his wife.

The appellant sought to corroborate her husband's statement of the agreement by the evidence of several witnesses who testified as to conversations with Mr. Hanford. A Mr. Barto says: That he overheard a conversation between Hanford and the defendant William S. Welch some time in December, 1886, or the forepart of January, 1887. That it was at the barn of what is known as the "Grant Farm." Mr. Hanford said to Welch, "You have not told me how you would swap places;" and Mr. Hanford says, "I want you to tell me what you will do." Mr. Hanford says, "You give me the Axford place, and I will let you work it for one-half. Then you give me a mortgage of $2,000 on this." "Well," Mr. Welch says, "that is as much as this is worth." "Well," he says, "that makes no difference. All I want out of this mortgage is my living,—as much as you can furnish of it from the farm,—and then the mortgage is to go to Alice, when I get through with it."

Another witness, one Sabin, who knew the parties, testifies as to having had a conversation with Mr. Hanford, informing him of the trade that he had made with Welch. "He told me that William gave him that Axford farm and a mortgage on this farm for $2,000. 'Well,' I said, 'You have got the mortgage high enough.' He says: 'Yes; that is just what I want. I want the $2,000 to show good

for the mortgage, because William may have mortgages and have judgments against him, and I want this to go to Alice when I die.' He said he wanted the mortgage large enough to cover the whole farm, so that, if judgment came against him (William), that Alice would hold it. 'This mortgage,' he says, 'you know, is to go to Alice at my death.' We were talking about things that didn't pertain to this matter,—some things in regard to the family, that I don't want to tell. He said he didn't pay any money; they didn't have to pay any money; from what they raised on the farm he got some things,— I think he said about thirty dollars a year."

Another witness, named Slocum, testified as to having had a conversation with Hanford, saying, "Uncle Gershom, you ought to help Alice all you can." He said:

" 'I have,' he says, 'and I calculate to,' he says. 'I have never got any money on that mortgage, and all I have ever had,' he says, 'is what I could get off from the place.' And he mentioned some butter and eggs, and, I think, grain, or something of that kind. He said they never paid him any money. Then he says— 'When I am done with it,' he says, 'it shall be hers.' He said he never received any money on the mortgage; that all he had ever been paid on it was the stuff he had taken off from the place; and he said, 'When I am gone, it shall be hers.' I never had any more conversation with him in regard to the mortgage. Mr. Hanford is an uncle of mine by marriage. I am no relation to Mrs. Welch."

Also, one Miller, who testified to having had a conversation with Mr. Hanford in the spring of 1892; that the witness, upon seeing Mr. Welch passing through his barn, said to Mr. Hanford:

" 'Mr. Hanford, it is pretty hard work for farmers just now.' 'Yes,' he said, 'but Will ought to keep straight, for I have got all the claim there is against them.' I says, 'Have you got a claim against them?' 'Yes,' he says, 'I have got a claim of $2,000.' I says, 'That is more than it is worth?' He says — 'It don't make any difference,' he says; 'I told Allie she should have the mortgage when I was done with it.' "

A witness named Johnston also testified to having had a conversation with Mr. Hanford, in which he says:

"I asked Mr. Hanford who this place belonged to,—referring to the place they lived on, the Grant place,—if that place belonged to Wm. Welch, or whether it was in his wife's name; and he says, 'I hold the mortgage on that place.' I don't remember that he told me the amount. He said he had the mortgage. I don't believe he told me. He said he held the mortgage, but he intended that Alice should have the place when he was through with it. I believe that was all that was said in relation to this. It might have been that he said he held the mortgage for all it was worth, and Alice should have it when he was through with it, but I don't remember. I can't be positive about it."

These several witnesses were not shaken upon their cross-examination, but some of them gave some few additional details, which it is unnecessary to set forth here, as they neither weaken nor strengthen the claim of either party.

To controvert the claim of the defendant the plaintiff called but a single witness, one Samantha Hanford, a sister-in-law of Gershom Hanford, who testified that shortly after the probate of the will of Mr. Hanford the defendant Alice Welch called at her house; and the witness testified that:

"She asked me if I knew about Uncle Gershom's will, and I told her I did not. I can't state just the words, but inquiring if I knew whether anything

was left to her, or if the place was left to her. Can't tell just the words. I said I did not know anything about it. She remarked, 'If we hadn't supposed we were going to have it, we never would have taken it, because it left so large a debt on our shoulders.' I said, 'Did Uncle Gershom ever say to you that you were to have it?' 'No; but he has done to others.' This is all the conversation that related to that. Q. You mean has told? A. Yes, sir; has told others. That is the substance of the conversation that occurred between us as to her Uncle Gershom's money."

I do not think such testimony helped the case of the plaintiff. While Mr. Welch testified that some of the conversations relative to the conveyance of the farms and the giving of the mortgage were in the presence of his wife, it was not claimed or testified to by him that Mr. Hanford promised his wife that he would assign the mortgage to her or bequeath it to her. His claim is that such agreement or promise was made with and to him for his wife's benefit. Upon the whole, it seems to me that, if the testimony of Mrs. Hanford is of any effect, it is rather corroborative of the defendant's theory than otherwise. It seems to me that the story of William Welch is abundantly corroborated,—corroborated, as before stated, by the undisputed fact of the giving of a mortgage for double the amount of the difference in value between the two farms; corroborated by the fact that nothing was paid upon said mortgage excepting farm produce,—the testimony of the witnesses Sabin and Slocum confirming the testimony of Welch in that respect; corroborated by the statements made by Hanford in his lifetime to the several witnesses whose testimony I have quoted, as to why he held the mortgage, and what was to become of it upon his death. It is claimed, however, that Welch's story is improbable; that it is improbable that he would trust such an important matter to a man's verbal promise; that, if any such agreement had been in fact made, it would have been embodied in the mortgage itself, or some other written memorandum made of it. Undoubtedly it was a loose and improvident method of doing business. But a large portion of the business that comes before our courts arises out of the loose and careless methods in which contracts are made, and while it calls upon the courts to scrutinize carefully the evidence by which they are sought to be established, and require that such evidence should establish a certain and definite contract, and not leave it to the court to spell out or patch up a contract that it thinks the parties ought to have made under the circumstances, yet, when the evidence amply and clearly establishes a clear and definite contract, the court will not disregard such evidence because it seems improbable that a person would make a contract in such an improvident manner. And any presumption arising from the supposed improbability of such a method of doing business will not be permitted to outweigh clear and ample evidence that a contract was in fact made in such a manner. With these considerations in mind, and after a careful consideration of the evidence, I am of the opinion that an agreement by the testator with William Welch, or promise to him, to assign the mortgage to the appellant Alice Welch or bequeath it to her by will, is fully and amply established. There was a consideration for such an agreement, in the conveyance of the Axford farm, and also

one from the appellant by her release of her right of dower in the Axford farm. William Welch has performed his part of the agreement. And "it is undoubtedly the settled law of this state that when a certain definite contract is clearly established, even though it involves an agreement to leave property by will, and it has been performed on the part of the promisee, equity, in a case free from all objections on account of the adequacy of the consideration, or other circumstances rendering the claim inequitable, will compel a specific performance." Gall v. Gall, 64 Hun, 601, 19 N. Y. Supp. 332; Gates v. Gates, 34 App. Div. 608, 54 N. Y. Supp. 454. Here there is no uncertainty or indefiniteness. The court is not required to spell out or to patch up an agreement. It knows the specific property, the subject of the agreement, and exactly what is to be done with it. The subject of the agreement is certain and definite: A mortgage upon a named farm, given by the promisor to the promisee. What is to be done with it is clear and precise. It is to be given to Alice Welch. How? Either by assignment or bequest. There is a consideration for it, and the promisee has fully performed on his part. And the equities in the case require its enforcement, rather than its nonenforcement. A failure to enforce it leaves the estate of Hanford in possession of both a mortgage for the full or nearly the full value of the one farm, and the farm given in exchange for such mortgaged farm, and strips the Welch family of everything, for no consideration. Where an agreement is made by the husband, for the benefit of his wife, with a third person, and the husband has performed his part of the agreement, such agreement can be enforced by the wife. Buchanan v. Tilden, 158 N. Y. 109, 52 N. E. 724.

For these reasons, the judgment appealed from, as against the appellant, Alice Welch, should be reversed, the referee discharged, and a new trial granted; costs to abide the event. All concur.